**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**KAREN SUE MOSKONAS,**

     **Plaintiff,**

**vs.**                             **CIVIL ACTION NO. 3:17-CV-00021**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social

Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II

and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C.

§§ 401-433, 1381-1383f. By Order entered January 4, 2017 (Document No. 4.), this case was

referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence,

and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C.

§ 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in support of Judgment on

the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 12 and

13.)

     Having fully considered the record and the arguments of the parties, the undersigned

respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

judgment on the pleadings (Document No. 12.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 13.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Karen Sue Moskonas (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on October 26, 2012, alleging disability since September 28, 2007[2], because of "degenerative disc disease, numb limbs, herniated discs, high blood pressure, osteoarthritis, acid reflux, IBS, inflammatory bowel d[i]sease, depression, pinched nerves in spine, and cervicalgia". (Tr. at 254.) Her claims were initially denied on March 8, 2013 (Tr. at 119-123, 124-128.) and again upon reconsideration on May 29, 2013. (Tr. at 135-141, 142-148.) Thereafter, Claimant filed a written request for hearing on July 2, 2013. (Tr. at 149-151.) An administrative hearing was held on September 23, 2014 before the Honorable Paul Gaughen, Administrative Law Judge ("ALJ"). (Tr. at 32-72.) On March 19, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time from September 28, 2007 through the date of the decision. (Tr. at 8-31.) On May 21, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 7, 315-319.) The ALJ's decision became the final decision of the Commissioner on December 29, 2016 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On January 3, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner

---

[2] The relevant period for Claimant's DIB claim begins on September 28, 2007 and ends December 31, 2007, her date last insured, DLI. 20 C.F.R. §§ 404.101(a), 404.131(a). The relevant period for Claimant's SSI claim begins on the application date of October 26, 2012 and ends on the date of the decision, March 19, 2015. 20 C.F.R. § 416.202.

filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 9 and 10.) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (Document No. 12.); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 13.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 41 years old as of the alleged onset date, and considered a "younger person" as of the date of the ALJ's decision and throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 24.) Claimant has a high school education and attended many business courses during high school. (Tr. at 255.) She also started some college classes through her employment at the bank. (Tr. at 43.) Claimant last worked on December 31, 2001 and was a stay at home mom until she became ill on September 28, 2007. (Id.) She last worked as a "collector" for banking and financial institutions, calling customers and typing (reporting) their conversations about their accounts. (Tr. at 277-279.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§

404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2007. (Tr. at 13, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of September 28, 2007. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: cervical and

---

disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

lumbar degenerative disc disease (DDD) with moderate facet arthritis and radiculopathy; and affective disorder, NOS. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work:

> except the claimant needs some sit/stand alternating option with ability to work on the feet standing or walking for no more than five or six hours total in an eight-hour workday and for no more than two hours at once; has no limitations with working in a seated position; cannot work at unprotected heights or driving dangerous equipment; cannot do work with unusual work stressors such as work requiring work on ladders, ramps, or uneven ground or work with mandatory overtime or without customary breaks; and cannot keep up with fast-paced production demands such as work with a rigid quota system that must be met throughout the day. Additionally, the claimant can do no work requiring higher level or sophisticated interaction or requiring sophisticated insight or judgment about people, but she can do routine and perfunctory social interaction with others including the retail public and can accept and respond appropriately to direction from a supervisor.

(Tr. at 16, Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 24, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 24-25, Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from September 28, 2007 through the date of the decision. (Tr. at 26, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts a number of errors in support of her appeal. First, Claimant argues that the ALJ improperly discredited the well-reasoned opinions provided by Claimant's treating

physician, Anna Patton, M.D., consultative examiner Drew C. Apgar, J.D., D.O., as well as consultative psychological examiner Cherie Zeigler, M.A., L.P. (Document No. 12 at 5-6.) By giving little weight to Dr. Patton's opinion, Claimant contends that the ALJ's RFC assessment was fatally flawed because it failed to account for the limitations Dr. Patton found. (Id. at 6-7.) The ALJ compounded this error when he ignored the vocational expert's opinion that in consideration of the limitations noted by Dr. Patton, Claimant would be incapable of substantial gainful activity. (Id. at 7.) Claimant asks for remand for an award of benefits, or for a rehearing. (Id.)

In response, the Commissioner defends the RFC assessment because it accommodated Claimant's limitations that were supported by the evidence of record. (Document No. 13 at 14.) Claimant's physical examinations were essentially normal, despite her allegations of pain. (Id. at 15.) The ALJ reviewed the examinations and medical record evidence that supported his findings ultimately reaching the RFC assessment. (Id.) With respect to Dr. Patton's opinion that Claimant had greater functional limitations, the objective medical record and other evidence did not support such restrictions. (Id. at 16-17.) Mere diagnoses do not prove one's disability. (Id. at 17.)

With respect to Claimant's mental impairments, the Commissioner argues that the RFC assessment is appropriate where the medical records indicate Claimant received sporadic mental health treatment, and had consistently normal mental health examinations. (Id.) The ALJ found Dr. Patton's opinions in this area unfounded by the medical evidence and with the other evidence of record. (Id. at 18.) Nevertheless, the ALJ did make accommodations in the RFC assessment by limiting Claimant's social interactions and by avoiding unusual work stressors. (Id.)

Finally, the Commissioner defends the ALJ's hypothetical questions to the vocational expert because the extreme limitations endorsed by Dr. Patton were not supported by the evidence

of record; the law in this Circuit clearly establishes that if limitations are not supported by the evidence, then an ALJ is not required to accept a vocational expert's testimony based on those limitations. (Id. at 19-20.) In closing, the Commissioner contends the final decision is supported by substantial evidence and asks that it be affirmed. (Id. at 20.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

**Physical Impairments:**

Medical Records Prior to Alleged Onset Date:

In March 1999, Claimant underwent surgery to correct a bowel obstruction at the Ohio State University Wexner Medical Center. (Tr. at 918-948.) She tolerated the procedure well and was discharged after several days in stable condition. (Tr. at 918.)

The earliest medical records concerning Claimant's back issues are dated August 4, 1992 when she presented to Mount Carmel Health with complaints of low back pain and left leg tingling. (Tr. at 957.) A myelogram was "quite normal", although a CT scan indicated minimal degenerative root bulging of the L5 disk. (Tr. at 957, 964, 965.) On October 3, 1996, Claimant was involved in an automobile accident and presented to the Fairfield Medical Center emergency department on a backboard with a cervical collar. (Tr. at 798.) Imaging showed mild degenerative change in the cervical and lumbar spines, and she was diagnosed with muscular strain. (Tr. at 798-799.) In August 2005, Claimant was injured and presented to Hocking Valley Community Hospital complaining of arm numbness; imaging of her cervical spine showed isolated degenerative

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

changes at C5-6 and no findings of fracture. (Tr. at 878.)

In April 2007, Claimant went to the Hocking Valley Emergency Department for increasing back pain after helping a friend move. (Tr. at 896-898.) An examination revealed no back tenderness and a negative straight leg-raising test. (Tr. at 898.) She was prescribed a muscle relaxant for a muscle strain. (Id.) In September 2007, Claimant returned to the Hocking Valley Emergency Department with complaints of left neck pain going into her left arm that had been constant for the last week; she believed she had herniated a disc in her neck. (Tr. at 915.) An MRI of the cervical spine showed a lateral recess to foraminal disc protrusion associated with a spur at C5-C6. (Tr. at 917.) She was diagnosed with cervical radiculopathy. (Tr. at 916.)

Medical Records After Alleged Onset Date:

In June 2008, Claimant received treatment for right sided pain and lumbar pain at Hocking Valley. (Tr. at 371, 377.) Her physical examination was normal except for mild right lower quadrant tenderness. (Tr. at 378.) In May 2010, imaging of the thoracic spine showed degenerative changes and mild spondylosis; thoracic segments were otherwise intact and normally aligned. (Tr. at 320, 355.) In July 2011, Claimant returned for complaints of back and flank pain she described as "mild" and "aching". (Tr. at 334.) She had limited lumbar range of motion, and was diagnosed with an acute lumbosacral sprain. (Tr. at 334-336.) During treatment for other acute complaints (breast pain and headaches in May and August 2010, respectively), examinations revealed normal musculoskeletal findings. (Tr. at 347, 357.)

In late 2011 and early 2012, Claimant complained of neck pain with tingling and numbness in her hands, arms, and legs. (Tr. at 382, 393.) On examination, she had normal range of motion of her neck, no tenderness, good ambulation, and symmetric strength throughout; she was

prescribed pain medication. (Tr. at 383.) When treated for a scratched eye in November 2011, Claimant had exhibited no back pain or gait problems, with normal range of motion, no edema, and no tenderness. (Tr. at 387-388.) She complained of neck pain with right arm numbness in February 2012 at King's Daughter Medical Center in Ashland, Kentucky; an examination revealed normal range of motion in the neck, normal musculoskeletal range of motion, and normal motor strength in the bilateral arms. (Tr. at 393-395.) Claimant also complained of back pain in February 2012; an examination showed normal range of motion, no edema, and no tenderness. (Tr. at 406, 415, 422.)

Claimant treated for neck pain at Catlettsburg FCC in March 2012; she had decreased cervical range of motion in lateral bending, with normal rotation, flexion and extension, and normal lumbar and thoracic range of motion with no tenderness, and normal strength and sensation in the hands. (Tr. at 433-434.) She was diagnosed with cervicalgia. (Tr. at 434.)

She continued to complain of chronic neck pain and tingling in April 2012 (Tr. at 442-443.), and subsequently underwent an MRI of the cervical spine, which showed no definite acute abnormality, but cervical spondylosis most advanced at C5-6; normal caliber and signal in the spinal cord; and normal appearing posterior fossa. (Tr. at 431-432.) On examination, Claimant had limited range of motion in the neck, especially going backwards. (Tr. at 440.) She returned for complaints of neck pain in October 2012, noting that the problem had been waxing and waning. (Tr. at 446.) An examination revealed decreased cervical range of motion, tenderness, pain, and spasm. (Id.)

In January 2013, Claimant continued to complain of neck pain with tingling. (Tr. at 457.) She had some reduced cervical range of motion and pain, but otherwise normal physical

examinations. (Tr. at 456-457, 627, 635.) When treated for acute cold symptoms in March 2013, she had no complaints of back or neck pain, myalgias, joint swelling, or gait problems. (Tr. at 613.) She exhibited a normal range of motion in her neck and musculoskeletal system, normal strength, normal coordination, and no sensory deficit. (Tr. at 614.) In July 2013, when Claimant complained of shortness of breath and chest pain after mowing the lawn, an examination revealed normal neck range of motion, no back tenderness, and no cyanosis, clubbing, or edema. (Tr. at 509, 517-518.) She reported being able to drive and manage her activities of daily living. (Tr. at 536.) She was diagnosed with muscle strain. (Tr. at 520.)

Drew Apgar, J.D., D.O., Consultative Examiner:

On February 8, 2013, Claimant underwent a consultative examination with Drew Apgar, J.D., D.O. (Tr. at 468-486.) Dr. Apgar observed Claimant was able to get on and off the examination table without difficulty; she had good posture while seated and standing; she was able to move about the room without difficulty; and she was able to dress and undress without difficulty. (Tr. at 473.) She had no mechanical limitations or shortness of breath due to obesity. (Tr. at 472.)

Dr. Apgar's examination revealed Claimant had normal joints and extremities; intact pinch and grasp; no edema; intact manipulation; a steady, deliberate and non-antalgic gait; normal spinal curves, and no evidence of spasm. (Tr. at 475-477, 479.) The examination also revealed that Claimant had full (5/5) strength in her upper and lower extremities with no significant range of motion compromise, including no range of motion deficits in her cervical and dorsolumbar spines. (Tr. at 479, 481, 482-485.) She was able to heel and toe walk, and squat and rise. (Tr. at 478.)

Her mental examination was normal. (Tr. at 480.) Her memory was intact, and she was able to maintain concentration and focus throughout the examination. (Id.)

12

Dr. Apgar diagnosed Claimant's physical conditions including chronic pain syndrome; non-specific joint arthrosis; carpal tunnel syndrome; lumbar and cervical degenerative joint disease; and obesity by history. (Tr. at 478-479.)

Based upon his clinical findings, Dr. Apgar opined that Claimant would have no difficulty sitting, standing, walking, traveling, lifting, carrying, pushing, pulling, bending, kneeling, stooping, crawling, handling objects with the dominant hand, hearing, or speaking. (Tr. at 480.)

State Agency Medical Consultants:

On March 6, 2013, Rogelio Lim, M.D. reviewed the record and opined that Claimant could perform medium work with occasional postural limitations. (Tr. at 80-81, 91-92.) Dr. Lim also opined that Claimant's multiple allegations were out of proportion with the objective findings. (Tr. at 81, 92.) On May 23, 2013, A. Rafael Gomez, M.D. concurred with Dr. Lim's findings. (Tr. at 104-105, 113-115.)

Anna Patton, M.D., Treating Physician:

Claimant began treatment with Dr. Patton in January 2013 for neck and back pain and medications refill. (Tr. at 625-640.) In August 2013, she continued to complain of neck and back pain to Dr. Patton, and reported that medication provided mild to moderate relief. (Tr. at 663-664.) She also complained of decreased range of motion and tenderness of the cervical and lumbar spine with pain and spasm; her physical examination was otherwise normal. (Tr. at 666.) Her pain medication was refilled. (Id.) Dr. Patton also ordered a lumbar MRI that showed mild to moderate disc disease with moderate facet arthritis, mild mass effect on the thecal sac with mild spinal canal narrowing, mild to moderate narrowing of the neural foramina at L4-5 and L5-S1, and an annular tear or radial fissure posteriorly at L5-S1. (Tr. at 603, 672.)

In September 2013, Claimant returned to Dr. Patton complaining of tingling, weakness, numbness, and headaches. (Tr. at 675.) Her physical examination was the same as it was in August, and her medications were continued. (Tr. at 677-678.) She was referred to the spine clinic, but she declined due to finances. (Tr. at 678.)

Claimant continued treatment for neck and back pain with Dr. Patton in November 2013, January 2014, and February 2014. (Tr. at 685-688, 695, 698, 706, 708-709.) Her physical examinations remained essentially the same, with essentially normal findings except for some range of motion deficits. (Tr. at 685-688, 695, 698, 708.) In February, she also had some tenderness to palpation of the sciatic notch. (Tr. at 709.)

Claimant followed up with Dr. Patton in April and July 2014. (Tr. at 717, 719, 732-734.) Her physical examinations were essentially the same; although she complained of some decreased range of motion, pain, and tenderness, her examinations were essentially normal. (Tr. at 719, 734.) Claimant reported mild to moderate relief with medication, and instructed that pain medication could help with activities of daily living, but could not resolve all symptoms; she was to follow up in two months, or sooner, if needed. (Tr. at 717, 732-733, 736.) In July, Claimant's urine drug screen was positive for marijuana, and she was restricted from narcotics. (Tr. at 743.)

**Mental Impairments:**

<u>Cherie Zeigler, M.A., Psychological Consultative Examiner:</u>

On January 7, 2013, Claimant underwent a psychological consultative examination with Cherie Zeigler, M.A., L.P. (Tr. at 461-467.) Claimant drove herself to the appointment, and arrived on time. (Tr. at 461.) Ms. Zeigler reviewed the Function Report form SSA-3373 completed by Claimant regarding her functioning. (Tr. at 462-463.) Claimant reported graduating from high

school, working at a bank and finance company, smoking marijuana, and facing an obstruction of justice charge for destroying a marijuana plant grown in her backyard. (Tr. at 463-464.)

On mental status examination, Claimant had a good, clean, neat appearance; good personal hygiene; full orientation; cooperative and attentive behavior; normal psychomotor activity, thought processes and content, perception, and memory; and good judgment. (Tr. at 464.) Her concentration was average, and her persistence and pace were within normal limits. (Id.) Her social functioning was "mildly deficient" based on her depressed mood and flat affect. (Id.) Ms. Ziegler noted that Claimant would be perfectly capable of paying her bills and keeping a checking or savings account. (Tr. at 466.) Ms. Zeigler diagnosed major depressive disorder, recurrent, moderate. (Tr. at 465.) Ms. Zeigler indicated that Claimant's prognosis was poor based on a severely depressed mood, reduced functioning, and physical problems; she noted that Claimant's depression was untreated. (Id.)

State Agency Psychological Consultants:

On March 7, 2013, Paula J. Bickham, Ph.D. reviewed the record and opined there was no evidence to substantiate a medically determinable mental impairment prior to Claimant's December 31, 2007 date last insured. (Tr. at 78, 89.) With respect to Claimant's SSI claim (with the relevant period beginning in 2012), Dr. Bickham found that Claimant had mild difficulties in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (Tr. at 79, 90.) Dr. Bickham concluded that Claimant did not have a severe mental impairment. (Id.) On May 25, 2013, Holly Cloonan, Ph.D. concurred with Dr. Bickham's findings. (Tr. at 101-103, 111-113.)

<u>Anna Patton, M.D., Treating Physician:</u>

When Claimant established treatment with Dr. Patton in January 2013 for neck and back pain, a psychiatric overview revealed that Claimant's mood, affect, behavior and thought content were normal. (Tr. at 627.) In August 2013, Dr. Patton again noted that Claimant's mood, affect, behavior, and thought content were normal. (<u>Id</u>.) In January 2014, Dr. Patton's examination of Claimant revealed normal mood, affect, behavior, and thought content, though her assessment included a diagnosis of depression. (Tr. at 698-699.) Dr. Patton restarted Claimant's mental health medication, Cymbalta. (<u>Id</u>.) In February and April 2014, Claimant's mental status examinations remained normal, and her mental health medication was continued. (Tr. at 709, 719-720.) In July 2014, Claimant reported doing well on Cymbalta for depression. (Tr. at 733.) She had a normal mental status examination, and her medications were refilled. (Tr. at 735.)

**Treating Physician Medical Source Statement**

On September 5, 2014, Dr. Patton completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) and responded to written questions from Claimant's attorney. (Tr. at 487-491.) Dr. Patton noted that Claimant had lumbar and cervical degenerative disc disease that affected her functional abilities. (<u>Id</u>.) She opined that Claimant could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 20 minutes at once and for three hours total in an eight-hour workday; sit for 30 minutes at once and for three hours total in an eight-hour workday; never climb, stoop, crouch, kneel, or crawl; occasionally balance; and that she had limitations reaching, handling, feeling, and pushing and pulling. (Tr. at 487-489.) Dr. Patton also opined that Claimant should avoid exposure to heights, moving machinery, temperature extremes, humidity, and vibrations. (Tr. at 489.) Dr. Patton stated that her opinions of Claimant's physical

functioning were based on imaging showing lumbar degenerative disc disease with moderate facet arthritis and cervical spondylosis; she believed Claimant's subjective complaints of pain were consistent with her objective findings. (Tr. at 490.)

Dr. Patton also opined that Claimant could not engage in full time employment because she had "severe depression." (Id.) She indicated that Claimant had some mood improvement with medication, but was unable to handle crowded places. (Id.) Dr. Patton indicated that Claimant had difficulty with interpersonal relationships, maintaining attention, and completing tasks. (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that her IBS caused her to have a twelve-pound fluctuation over a six-week period. (Tr. at 44-45.) Claimant's alleged onset date is when she had an MRI after obtaining a medical card to see what health problems she was experiencing. (Tr. at 45.) Claimant testified that in 2007, her neck caused her problems, with difficulty reaching above her shoulders or any kind of lifting, she experienced numbness, that her legs would go weak, and that she would drop to the ground. (Tr. at 47.) She also had depression, high blood pressure and acid reflux then as well. (Tr. at 47, 50.) She testified that her condition had worsened over the years. (Tr. at 47.) Though she did not believe she could have worked full time, Claimant did not file for disability because she really did not know that she could apply for it. (Tr. at 47-48.)

Claimant described the pain in her neck as starting in her hair and working down into her shoulders and lower back, where she felt numb and causing her legs to become weak. (Tr. at 49.) Her pain is constant. (Id.) She would fall whenever she lifted something, almost once a day. (Id.) She does not experience falling episodes anymore, but the numbness remains. (Tr. at 49-50.)

17

She also has arthritis and carpal tunnel in both hands, but did not have the surgery. (Tr. at 50.) Claimant stated that her irritable bowel syndrome and inflammatory bowel disease were diagnosed in 1999. (Tr. at 50-51.) Because of her bowel issues, she must remain close to a bathroom and has experienced accidents. (Tr. at 51.)

Claimant testified that she received treatment for depression back in 2007 with medication, although she did not receive any outpatient psychiatric or psychological therapy of any kind. (Tr. at 52.)

Claimant estimated that back in 2007 she could walk about half a mile, but because her legs would get weak, she would have to sit for about twenty minutes or so before she could walk again. (Tr. at 53.) Walking and standing hurt her lower back; she estimated that she could stand about fifteen minutes, however, she had to shift between sitting and standing, preferring to stand. (Tr. at 54.) She also explained that lifting her thirty-pound niece on occasion would cause her legs to go weak. (Id.)

Claimant has a hearing aid for her right ear, but had not used it much because it needs to be replaced or repaired. (Tr. at 56-57.) Though she had not been prescribed a cane, Claimant used one in the last couple of years, especially after driving for a long period. (Tr. at 57.) She has a driver's license and drove herself to the hearing. (Id.)

Claimant stated that Dr. Patton had been treating her since early 2012 for her degenerative disc disease, her neck and back, and depression, and that she sees her on average every two to three months. (Tr. at 60-62.)

Ellen Jenkins, Vocational Expert ("VE") Testimony:

The VE classified Claimant's past work as a collector as semi-skilled light work, sedentary

as performed. (Tr. at 63.) The ALJ provided a hypothetical where an individual with Claimant's vocational profile (age, education, and work experience) with the restrictions contained in the RFC, described *supra* (Tr. at 64-65, 66-68.) The VE testified that such an individual could perform the representative jobs of photocopier operator, sorter/grader and ticket marker/pricer. (Tr. at 68-69.) Claimant's counsel provided a hypothetical where an individual could only lift 10 pounds frequently and 20 pounds occasionally; stand or walk for three hours in an eight-hour day and twenty minutes at a time; and sit for three hours in an eight-hour day and thirty minutes at a time, based on the limitations in Dr. Patton's opinion. (Tr. at 70.) The VE testified that no jobs existed. (Id.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As previously stated, Claimant argues the ALJ erred in his RFC assessment because he failed to include the limitations found by her treating physician, Dr. Patton, whose opinion was corroborated by Dr. Apgar and Ms. Zeigler. (Document No. 12 at 6.)

The Evaluation of Opinion Evidence:

The Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1)

Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ first addressed Claimant's physical impairments with respect to Dr. Patton's medical source statement. The ALJ noted that "Dr. Patton indicated that her opinions of the claimant's functioning are based on imaging showing lumbar DDD with moderate facet arthritis and cervical spondylosis." (Tr. at 21, 487-491.) The ALJ further stated

> These opinions are given little weight because they are not supported by the objective medical evidence of record showing that the claimant has mostly normal physical examinations with more severe symptoms associated with more strenuous physical activity. Additionally, the claimant's pain complaints are controlled with pain medications.

(Tr. at 21.) In accordance with the aforementioned Regulations, the ALJ acknowledged that Dr. Patton had been treating Claimant since 2012 and that Claimant sees her every two months for her neck and back problems. (Id.) The ALJ noted that Claimant reported that Dr. Patton does examine her, although not at each visit. (Id.) Dr. Patton was also noted for treating Claimant's depression. (Id.) In addition, the ALJ reviewed the medical records from 2012 through 2014 where Dr. Patton found Claimant's physical examinations normal, even though Claimant continued to complain of pain, numbness and tingling, and that Claimant's medications were reportedly providing some or moderate relief, and were refilled. (Tr. at 20-21.)

With regard to Dr. Apgar's opinions that Claimant "would have no difficulty sitting, standing, walking, traveling, lifting, carrying, pushing, pulling, bending, kneeling, stooping,

crawling, handling objects with the dominant hand, hearing, or speaking", the ALJ stated that "[t]hese opinions are consistent with the record and given weight." (Tr. at 21.) Dr. Apgar was noted to be a one-time consultative examiner, whose observations and diagnoses were faithfully reproduced in the ALJ's written decision. (Id.)

Next, the ALJ addressed Claimant's mental impairments, finding the "objective evidence does not support the claimant's alleged severe symptoms." (Tr. at 22.) The ALJ noted that Claimant's mental health treatment was not only "very sporadic", but also her "mental status was consistently normal throughout the record" though she was prescribed medication for depression. (Id.) The ALJ contrasted this evidence with the findings observed by the consultative examiner, Ms. Zeigler, who opined that Claimant's prognosis was poor "based on a severely depressed mood, reduced functioning, and physical problems" and that Claimant's "depression was not treated." (Id.) Again, the ALJ noted Dr. Patton's opinion that Claimant had severe depression, "had some mood improvement with medication, but is unable to handle crowded places." (Tr. at 23.) The ALJ also acknowledged Dr. Patton's indication that Claimant "has difficulty with interpersonal relationships and has difficulty maintaining attention and completing tasks." (Id.) Once again, the ALJ gave these opinions "little weight because the record shows that the claimant has a history of completely normal mental status examinations and had minimal mental health treatment." (Id.) In three of the four functional areas, the ALJ determined Claimant's limitations were mild or none, which was supported by the State agency opinion evidence (Tr. at 24.), however, the ALJ determined that Claimant's social functioning presented moderate limitations:

> The claimant alleges she has some difficulty interacting with others, especially when in pain. Nonetheless, the evidence shows that she does have friends and otherwise maintains meaningful relationships with other people. The claimant said she goes out three to four times per week; drives; and is able to go out alone. She

shops in stores and reported interacting with relatives and going to church every couple of weeks. The claimant said she is not pleasant when in pain and does not get along with her neighbor . . . The claimant's doctors also describe her as cooperative and pleasant, and she did not appear to have difficulty interacting and answering questions at the hearing. Nonetheless, the claimant has demonstrated that her mental impairments limit some social interactions.

(Id.)

From the aforementioned, the ALJ provided appropriate and thorough explanation for giving little weight to Dr. Patton's opinions regarding Claimant's physical and mental impairments under Fourth Circuit jurisprudence. Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986); Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985). It is important to recognize that Dr. Patton's opinion restricting Claimant's functional capabilities in lifting/carrying, walking/standing, and sitting in an eight-hour workday is a "residual functional capacity . . . or the application of vocational factors", an issue solely reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Moreover, pursuant to Sections 404.1527(d)(3) and 416.1527(d)(3), the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Accordingly, the ALJ provided "good reasons" for giving Dr. Patton's opinions little weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The undersigned **FINDS** that the ALJ's evaluation of the opinion evidence, particularly with respect to Dr. Patton, is based upon substantial evidence.

The RFC Assessment:

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job;

this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Following the discussion of the medical evidence regarding Claimant's physical impairments, her allegations and testimony of same, and the evaluation of the opinion evidence, the ALJ summarized the physical RFC assessment:

> based on the entire record, the undersigned finds that due to the claimant's physical impairments, the claimant is capable of performing work at the light exertional level, except the claimant needs some sit/stand alternating option with ability to work on the feet standing or walking for no more than five or six hours total in an eight-hour workday and for no more than two hours at once . . . This decision is supported by the opinions of the state agency medical consultants who opined that the claimant had no medically determinable physical impairment prior to the date last insured, but since the application filing date, the claimant can perform work at the medium exertional level, but can occasionally perform postural adjustments . . . However, new evidence shows that the claimant is more limited than was determined by the state agency medical consultants.

(Tr. at 21-22.)

Turning to Claimant's mental impairments, the ALJ expressly considered the entire record, determining that Claimant

> can do no work requiring higher level or sophisticated social interaction or requiring sophisticated insight or judgment about people, but she can do routine and perfunctory social interaction with others including the retail public and can accept and respond appropriately to direction from a supervisor. This decision is supported by the opinions of the state agency psychological consultants who opined that the claimant had no medically determinable mental impairment prior to the

date last insured and since the application filing date, the claimant's mental impairments are not severe.

(Tr. at 24.)

The RFC assessment concerning both Claimant's physical and mental impairments included the required narrative discussion that allows for meaningful judicial review and with respect to the findings of fact and conclusions provided in the written decision, it is clear that the ALJ complied with the mandate to "build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

Finally, based on the little weight assigned to Dr. Patton's opinion, particularly with respect to the postural limitations in an eight-hour period, the ALJ was not duty bound to pose a hypothetical question to the VE including those limitations. Hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence, and further **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the

Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: July 24, 2017.

Omar J. Aboulhosn
United States Magistrate Judge